

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. BERNARD CITIZENS FOR BETTER GOVERNMENT, ET AL | CIVIL ACTION |
| v. | NO. 02-2209 |
| ST. BERNARD PARISH SCH. BD., ET AL | SECTION "C" (4) |

## REASONS

On January 19, 2002, St. Bernard Parish, Louisiana ("Parish"), voters approved a plan in accordance with Act 173 of the 2001 Louisiana legislature. The vote reduced the size of the Parish School Board ("Board") from eleven members elected from single-member districts to seven members, including five elected from single-member districts and two elected at large ("the 5-2 plan"). The apportionment mirrors that of the Parish Council, where the 5-2 plan has been in effect for a decade. Qualifying for the Board was set for August 21-23, 2002, with the election scheduled for October 5, 2002.

According to Defendants' uncontradicted allegations, the redistricting arises from a bill designed by State Representative Kenneth Odinet. Upon the collection of a sufficient number of petitions, the bill required the Parish to hold a referendum to adopt a plan consisting of five

DATE OF ENTRY
SEP - 5 2002

1



Board seats representing single-member districts and two at-large seats. On May 31, 2001, the bill was enacted as Act. No. 173 of 2001 ("Act. No. 173").

On January 19, 2002, Parish voters then approved the current plan. Qualifying for Board membership was set for August 21-23, 2002, with the election set for October 5, 2002.

On July 19, 2002, however, Plaintiffs filed their class-action Complaint for Declaratory and Injunctive Relief. It is alleged that Plaintiff St. Bernard Citizens for Better Government is an unincorporated association of Parish residents concerned with black citizens' civil rights and whose individual members are injured by the 5-2 plan. Individual class Plaintiffs are, as stipulated at trial, black Louisiana citizens, Parish residents, and registered Parish voters. Plaintiffs claim that the 5-2 plan violates the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment. Accordingly, Plaintiffs sought relief pursuant to § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and 42 U.S.C. § 1983, as well as court costs, expenses, and attorney's fees pursuant to §§ 1973l(e) and 1988.[1]

On August 16, 2002, Plaintiffs moved for a preliminary injunction on their § 2 claim. An evidentiary hearing were held August 19 and 21, 2002. At the hearing, the Court suggested a consolidation of the hearing with a trial on the merits as to the § 2 claim pursuant to Federal Rule of Civil Procedure 65(a)(2). The parties agreed to the conversion. Relief was granted on August 21, 2002, without written reasons. The Court sets out those reasons, including findings of fact and conclusions of law, here.

---

[1] The Court does not address here Plaintiffs' claims other than those pursuant to § 2.

I. Class certification

One or more members of a class may sue as representative parties on behalf of all if those class members meet the requirements of Rules 23(a) and fit within one of the categories of Rule 23(b). *See Bolin v. Sears Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000). The requirements of Rule 23(a) are as follows:

> (1) the class is so numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the class, (3) the claims of
> the representative parties are typical of the claims, and (4) the
> representative parties will fairly and adequately protect the interests of the
> class.

The defendant has not contested the appropriateness of this matter proceeding as a class action. With respect to the first Rule 23(a) requirement, the identified class is all present and future voting-age African Americans who reside, or who will reside, in the Parish. According to the 2000 census, the black population of the Parish is 5,122 and the black voting age population is 3,243. Joinder of all those persons is impractical and so the numerosity element is met. As to the second prong, the stated common questions of law and fact are basically whether the election districts being challenged would result in dilution of black voting strength in violation of law and whether another plan can be devised which would not have that effect. Thus, the common issue element is met. As to the third requirement, the named plaintiffs are identified as black registered voters in St. Bernard Parish. Their claim of vote dilution is typical of the claim being brought on behalf of the class, the remaining current black registered voters as well as future black registered voters in the parish. Thus, the typicality element is met. Finally, the named plaintiffs, being black registered voters of the parish, claim the same injury that affects the rest of the class and

ask for the same relief that would be of benefit to the class. Their representation of the class is adequate.

A further element necessary to proceed as a class action here is whether "adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). As the relief sought is the voiding of the election system for the Board, an adjudication on behalf of any individual member of the class would be dispositive of all others.

Consequently, the Court certified the action as a class action pursuant to Rule 23.

II. The Voting Rights Act of 1965, as Amended, 42 U.S.C. § 1973: In General

The Voting Rights Act seeks to prevent political bodies from implementing election systems or practices that operate, whether intentionally or not, to minimize, cancel, or dilute the voting strength or political effectiveness of minority groups. *See E. Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson*, 691 F. Supp. 991, 995-96 (E.D. La. 1988), *aff'd*, 926 F.2d 487 (5th Cir. 1991). The two primary components of the act are §§ 2 and 5. Section 2 applies to all state and governing authorities, whereas § 5 is applicable to only certain jurisdictions, *see Holder v. Hall*, 512 U.S. 874, 883, 114 S. Ct. 2581, 2587, 129 L. Ed.2d 687 (1994), of which Louisiana is one, *see* 28 C.F.R. pt. 51, App. Relief under § 5 is available only through the U. S. Attorney General or the U.S. District Court for the District of Columbia. *See*

*Perkins v. Matthews*, 400 U.S. 379, 385, 91 S. Ct. 431, 435, 27 L. Ed.2d 476 (1971).[2]

This matter is brought pursuant to § 2 of the Act. That section reads as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

42 U.S.C. § 1973. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 2764, 92 L. Ed.2d 25 (1986).

---

[2]The Court notes that on August 20, 2002, the U.S. Department of Justice advised that the Attorney General did not oppose the specified changes in the law. Defs' Ex. 37. Approval by the Justice Department under § 5 does not foreclose a voting rights challenge under §2. *See E. Jefferson Coalition*, 691 F. Supp. at 994 n.1. The two sections "differ in structure, purpose and application." *Holder*, 512 U.S. at 883, 114 S. Ct. at 2587, 129 L. Ed.2d 687. The Justice Department letter itself acknowledges that "failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes." Defs' Ex. 37.

III. Application of § 2 to the 5-2 and 11-member Plans: Findings of Fact and Conclusions of Law

As the above would indicate, an analysis of a § 2 claim is necessarily fact-specific. *See Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1203 (5th Cir. 1989) (citing *Velasquez v. City of Abilene*, 725 F.2d 1017, 1020 (5th Cir. 1984)). The Court makes the following factual findings with respect to the instant claim, based on the stipulations, exhibits and testimony presented at the hearings and draws the following conclusions of law:

Louisiana law requires redistricting by school boards every ten years, based on the federal decennial census. *See* La. R.S. § 17:71.1, 17:71.3. The purpose of the reapportionment is to equalize the population between districts. This complies with the Equal Protection Clause requirement that each person's vote be given equal weight in the election of their representatives. *See Connor v. Finch*, 431 U.S. 407, 416, 97 S. Ct. 1828, 1834, 52 L. Ed.2d 465 (1977).

Cedric Floyd ("Floyd") is the President and Chief Executive Officer of Data Center, a redistricting company with 20 years of experience in Louisiana. *See* Pls.' Ex. 1. Among Floyd's specialties is devising redistricting plans that take into consideration the requirements of the Voting Rights Act. *See* Defs'. Ex. 14, Ex. 6 at 017. He was stipulated to be an expert demographer for purposes of this trial. As a result of the 2000 census, in spring 2001, Floyd determined that the then-current eleven-member districts for the Board were impermissibly unequal in population, with a deviation of 33.7 percent. *See id.* at 018.

Floyd contacted Defendant Frank Auderer, Jr. ("Auderer"), the Board's superintendent, advised him of his findings and offered his services to draw new district lines. *See* Testimony of Floyd. Floyd was hired by the Board in June 2001, to draft such plans. *See id.* From June 2001 through January 2002, Floyd was in periodic contact with Auderer regarding the progress of his

6

plans. *See id.*

From the inception of his employment, Floyd advised Auderer of the capability of creating a majority black population district, a proposed District 9, that would be in compliance with both the Equal Protection Clause and the Voting Rights Act. *See* Testimony of Floyd; Testimony of Auderer. Auderer advised him to prepare such a plan to be presented to the Board. *See* Testimony of Floyd. Floyd did so. *See id.* In January 2002, Floyd met on different occasions with ten of the eleven Board members to present his proposal. *See id.* All of these Board members were "acceptive" of the plan. *See* Testimony of Auderer. *See also* Testimony of Floyd. The Board never formally voted on the plan as the referendum to change the configuration from the 11-member plan to the 5-2 plan passed that same month. *See id.*

The plan that the Board had found "acceptive" provided for a majority black population but not a majority black *voting age* population. *See* Testimony of Floyd. However, through a relatively minor adjustment, Floyd revised the proposed District 9 so as to include a 54 percent black population and a 50.3 percent black voting age population. Under the proposed plan, District 9 would be the smallest of the eleven districts in population, with 5,458 people, and District 10 would be the largest, with 6,320 people. *See* Testimony of Floyd. This creates a deviation of 14 percent for the districts. The districts do not have to be exactly the same in population. *See Mahan v. Howell*, 410 U.S. 315, 329, 93 S. Ct. 979, 987, 35 L. Ed.2d 320 (1973); *Magnolia Bar Ass'n, Inc. v. Noble*, 793 F. Supp. 1386, 1403 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir.), *cert. denied sub. nom., Magnolia Bar Ass'n v. Hawkins*, 510 U.S. 994, 114 S. Ct. 555, 126 L. Ed.2d 456 (1993). Deviations to this degree and higher have been found acceptable. *See id.*

From its inception until the referendum in January 2002, the Board has consisted of eleven members elected from single-member districts. *See* defendants' memo at 7, 28. This case involves a challenge to the new 5-2 redistricting plan in the Parish, claiming it is dilutive as compared to the 11-member district previously in place. Under the 5-2 plan, five members of the Board would be elected from single-member districts, each with an approximate population of 13,446. *See* Defs.' Ex. 14, Ex. 4 at 003.

The total black population of the Parish is 5,112. *See id.* Even if the entire black population resided in one district, which it does not, it would constitute only 38 percent of the population and less of the voting age population. *See id.* at 004-006. In Parish schools, 13-14 percent of the student population is black, twice the black population of the parish. *See* Testimony of Auderer. In the proposed District 9 is located an elementary school that is 85 percent black and a middle school that is 30 percent black. *See id.*

IV. §2 of the Voting Rights Act

"At the heart of a § 2 vote dilution claim lies the issue of whether minorities have an equal opportunity to elect their candidates of choice." *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 497 (5th Cir. 1987), *cert. denied*, 492 U.S. 905, 109 S. Ct. 3213, 106 L. Ed.2d 564 (1989). The analysis of a § 2 claim requires two primary steps, with substeps in each. First, the minority plaintiffs must meet three conditions as set forth by the U.S. Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed.2d 25 (1986). Secondly, the plaintiffs must show "the circumstances of the local political landscape" which, taken together with the first et of factors, establish an abridgement or denial of their voting rights. *See NAACP*

*v. Fordice*, 252 F.3d 361, 365-66 (5th Cir. 2001). The latter "totality of the circumstances" test is guided by a series of nine separate considerations. *See id. See also Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc).

Under *Gingles*, the plaintiff must first establish that the minority group is "sufficiently large and geographically compact enough to constitute a majority in a single-member district"; second, whether the minority is "politically cohesive"; and third, whether the majority "votes sufficiently as a bloc . . . usually to defeat the minority preferred candidate." *See Gingles*, 478 U.S. at 49-51, 106 S. Ct. at 2766-67, 92 L. Ed.2d 25 (internal citations omitted).

With respect to the first factor, the black population in the proposed district is sufficiently large to constitute a majority both in general population and voting age population. The defendants stipulated at the trial on August 19, 2002, that Floyd's proposed District 9 satisfies this aspect of the first *Gingles* precondition. As for geographical compactness, a proposed district is sufficiently compact if it retains a natural sense of community. *E. Jefferson Coalition*, 691 F.Supp. at 1007. The Court has viewed the map of the proposed District 9 and finds it to be compact and reasonable in shape and size. *See* Ex. 39.

The defendants assert, however, that the proposed redistricting plan fails under the first *Gingles* precondition overall because it is an impermissible attack based on the size of the governing body. As the defendants note, in *Holder v. Hall*, 512 U.S. 874, 114 S. Ct. 2581, 129 L. Ed.2d 687 (1994), the U.S. Supreme Court held that the size of a governing authority is ordinarily not an appropriate target for a § 2 vote dilution challenge. The reason for this is that generally speaking, "[t]here is no principled reason why one size should be picked over another as the benchmark for comparison." *Id.* at 881, 114 S. Ct. at 2586, 129 L. Ed.2d 687.

9

On the other hand, if there is "an objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice," then it may be challenged under §2. *See id.*; *Concerned Citizens for Equality v. McDonald*, 63 F.3d 413, 416 (5th Cir. 1995); *Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973, 986 (1st Cir. 1995). The Court concludes that the 11-member proposed black voting majority district satisfies *Holder*'s benchmark requirement. The 11-member proposed plan is objective, workable, and reasonable. It has been in existence since the Board's inception and is currently functioning as an 11-member body. Thus, maintaining the size of the currently operational 11-member board will be minimally intrusive. Parish voters are likely to be familiar with the boundaries of most of the districts. Finally, as a practical matter, given that the Board currently is comprised of 11 members, each representing a single district, the "switch back" from the 5-2 plan, under which members have not yet been elected, to the benchmark is logistically unobtrusive.

With respect to the second and third *Gingles* factors, racial bloc voting is the standard for proving a §2 violation. *See Citizens for a Better Gretna*, 834 F.2d at 499; *Westwego Citizens*, 872 F.2d at 1207. The purpose of examining voting patterns is to determine whether the minority group acts in a politically cohesive way and "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56, 106 S. Ct. at 2769, 92 L. Ed.2d 25. Political cohesiveness may be shown by establishing that "a significant number of minority group members usually vote for the same candidates." *Id.*, 106 S. Ct. at 2769, 92 L. Ed.2d 25. "And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Id.*, 106 S. CT. at 2769, 92 L. Ed.2d 25.

In assessing whether racial bloc voting occurs, the appropriate focus is on elections in which a minority group member is a candidate. *See League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993); *Westwego Citizens*, 872 F.2d at 1208 n.7; *Campos v. City of Baytown*, 840 F.2d 1240, 1245 (5th Cir. 1988), *cert. denied*, 492 U.S. 905, 109 S. Ct. 3213, 106 L. Ed.2d 564 (1989); *Citizens for a Better Gretna*, 834 F.2d at 503-04; *Magnolia Bar Ass'n*, 793 F. Supp. at 1399; *Williams v. City of Dallas*, 734 F.Supp. 1317, 1387-88 (N.D. Tex. 1990). "[W]here a minority group has begun to sponsor candidates just recently the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Gingles*, 478 U.S. at 57 n.25, 106 S. Ct. at 2770 n.25, 92 L. Ed.2d 25. "Plaintiffs may rely on evidence from 'exogenous' elections, or elections involving other offices, to establish racially polarized voting where there is sparse data from 'indigenous' elections involving the office in issue." *Magnolia Bar Ass'n*, 793 F. Supp. at 1399 (citing *Citizens for a Better Gretna*, 834 F.2d at 502).

Defendants stipulated that no black person has ever been elected to Parish public office, nor has any black person ever run for a Board seat.

In 1991, Thomas Johnson ("Johnson"), a black man, ran for Parish Council President. *See* Pls.' Ex. 2. Four white men also ran in that race. *See* Pls.' Ex. 2.[3] To assess the voting patterns, the Court separated the precincts into two groups, based on the 1990 census. *See* Ex. 40. In the first group are those precincts with a black population of fewer than 100 persons. This amounted

---

[3]The parties stipulated at trial to the race of the candidates.

11

to 31 precincts,[4] with a white:black percentage ratio ("white:black ratio") of 99.7:.3.[5] *See* Ex. 40. The remaining eight precincts[6] had an 85:15 white:black ratio. *See id.* In the precincts that were virtually exclusively white, Johnson came in fifth of the five candidates with less than one-half of one percent of the vote. *See* Pls.' Ex. 2. In the precincts with the greater black minority, Johnson still came in fifth, but with 8 percent of the vote. *See id.* As Johnson received apparently negligible cross-over votes in the nearly all white precincts, his significantly better showing in the precincts with a 15 percent minority population cannot realistically be attributed to white cross-over votes, but rather to blacks voting for him.

In the same election, gubernatorial candidates were also on the ballot. Among the twelve candidates were incumbent Republican Governor Buddy Roemer; the eventual winner, Democract Edwin W. Edwards ("Edwards"); and Republican David Duke ("Duke"), *see* Ex. 36, well known for his ties to the Ku Klux Klan and white supremacist views. *See, e.g., Headliners; Party Animus*, N.Y. Times, Mar. 17, 1991, at § 4 (Week in Review Desk), at 7. In the primary, Duke won 51 percent of the Parish vote. *See* Ex. 36. In the run-off election between Duke and Edwards, Duke won 56 percent of the Parish vote. *See* Ex. 33. Louisiana State Senator Lynn Dean ("Senator Dean") testified at the trial on August 19, 2002, and attempted to justify the vote for Duke in the run-off as the "lesser of two evils." This justification, however, does not explain how Duke won 51 percent of the primary vote when the voters had ten other candidates, besides

---

[4]Precincts 10-18, 20-28, 30-36, 40, 43, 51, 53, 57-58. *See id.*

[5]The Parish has a very small percentage of nonblack minorities, *i.e.*, Asian or other, but for purposes of this assessment, the Court combined the black and white populations and determined percentages based on that figure. The Court did the same with the 2000 census.

[6]Precincts 41-42, 44, 50, 52, 54-56. *See id.*

12

Edwards, to choose from, including the incumbent governor. It is also worth noting that the Parish is, according to the defendants' memorandum in opposition to the motion for a preliminary injunction ("defendants' memo"), nearly 65 percent registered Democrat and just 19.5 percent registered Republican. *See* defendants' memo at 6.

Other relevant elections took place later in the 1990's. The Court utilized the 2000 census results, *see* Defs.' Ex. 14, Ex. 2 at 014-021, as a more accurate gauge of the white/black population in those elections. Again, the Court separated the precincts into two groups--those with fewer than 100 black residents and those with more than 100. The first group of precincts had a 99.5:.5 white:black ratio. *See id.*[7] The second group of precincts had an 84:16 white:black ratio. *See id.*[8] The 1995 gubernatorial election pitted a white man, Republican Mike Foster ("Foster"), against a black man, Democrat Cleo Fields ("Fields"), in the run-off. *See* Ex. 35. In the Parish's overwhelmingly white precincts, Fields received approximately 12 percent of the vote as compared to Foster's 88 percent. *See id.* In the combined precincts with an 84:16 white:black ratio, Fields received over twice as many votes–23 percent to Foster's 77 percent. *See id.* In Precinct 44, the Parish's only predominantly black precinct, *see* Defs.' Ex. 14, Ex. 2 at 020,[9] Fields received 61 percent of the vote to Foster's 39 percent. *See* Ex. 35.

In 1999, two black men were candidates for separate Parish offices. Stacy Riley, Sr. ("Riley"), ran for Parish Councilman in District D against five white candidates. *See* Pls.' Ex. 4.[10]

---

[7]Precincts 10-18, 20-22, 24-28, 30, 32-36, 40, 53, 57, 58. *See id.*

[8]Precincts 23, 31, 41-44, 50-52, 54, 55-56. *See id.* at 016-021.

[9]The precinct has a 26:74 white:black ratio. *See id.*

[10]The parties stipulated at trial to the race of the candidates.

13

The only predominantly black precinct in the parish, Precinct 44, is in District D. *See* Defs.' Ex. 14 at Ex. 4. The remaining precincts in District D have a 94:6 white:black ratio.[11] *See id.* Riley finished last. *See* Pls.' Ex. 4. However, Riley "won" in the predominantly black precinct, receiving 53 percent of the vote as compared to 47 percent garnered by the five other candidates combined. *See id.* In the remaining, overwhelming white precincts, Riley received just 5 percent of the vote. *See id.*

A black man, Kevin Williams ("Williams"), also ran for District E Councilman against two white opponents. *See* Pls.' Ex. 3.[12] Of the precincts that make up District E, two have a 25 percent black population.[13] *See* Defs.' Ex. 14 at Ex. 4. The remaining seven precincts are 94 percent white.[14] *See id.* In the precincts with a 25 percent black population, Williams received thirty percent of the vote. *See id.* In the overwhelmingly white precincts, he received 14 percent of the vote. *See id.*

Finally, also in 1999, incumbent Republican Governor Foster ran for re-election. *See* Ex. 41. His only significant opponent was Congressman William Jefferson, a black Democrat. *See id.* In the overwhelmingly white Parish precincts,[15] Jefferson received 8 percent of the vote compared to Foster's 92 percent. *See* Ex. 41. In the precincts that were 84 percent white,[16]

---

[11]Precincts 40-43A. *See id.*

[12]The parties stipulated at trial to the race of the candidates.

[13]Precincts 50 and 52. *See id.*

[14]Precincts 51, 53-58. *See id.*

[15]*See* Defs.' Ex. 14 at Ex. 4.

[16]*See* Defs.' Ex. 14 at Ex. 4.

Jefferson received 19 percent of the vote as compared to Foster's 81 percent. *See* Ex. 41. And finally, in the predominantly black Precinct 44,[17] Jefferson received 67 percent of the vote as compared to Foster's 33 percent. *See* Ex. 41.

These comparisons clearly establish both the second and third *Gingles* factors–that blacks act as a politically cohesive unit and whites vote as a bloc to defeat a minority candidate.

Once the three-part *Gingles* factors are established, the Court is then instructed to look to additional factors initially set forth in the Senate Judiciary Committee Report accompanying the 1982 amendment of the Voting Rights Act and adopted by the Fifth Circuit. *See Zimmer*, 485 F.2d 1297. They are as follows:

> (1) The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> (2) The extent to which voting in the elections of the state or political subdivision is racially polarized;
> (3) The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the majority group;
> (4) If there is a candidate slating process, whether the members of a minority group have been denied access to that process;
> (5) The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> (6) Whether political campaigns have been characterized by overt or subtle racial appeals;
> (7) The extent to which members of the minority group have been elected to public office in the jurisdiction.

See *Citizens for a Better Gretna,* 834 F.2d at 498-99. Two additional considerations are (8)

---

[17]*See* Defs.' Ex. 14 at Ex. 4.

15

"whether there is a sufficient lack of responsiveness on the part of elected officials to the particularized needs of the minority group" and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Fordice*, 252 F.3d at 367. The plaintiffs are not required to prove any particular number of factors or that a majority of them point in their direction. *See Gingles*, 478 U.S. at 45, 106 S. Ct. at 2763, 92 L. Ed.2d 25. The most important of the Senate factors are (1) "the 'extent to which minority group members have been elected to public office in the jurisdiction'" and (2) "the 'extent to which voting in the . . . political subdivision is racially polarized.'" *See id.* at 48 n.15, 106 S. Ct. at 2765 n.15, 92 L. Ed.2d 25[18]; *Clark*, 88 F.3d at 1397. If those factors are present, then the remaining ones "are supportive of, but *not essential to*" the success of the minority's claim. *See Gingles*, 478 U.S. at 48 n.15, 106 S. Ct. at 2765 n.15 (emphasis in original).

With respect to the first factor, as was aptly stated in the lower court decision in *Citizens for a Better Gretna:*

> The history of black citizens' attempts, in Louisiana since Reconstruction, to participate effectively in the political process and the white majority's resistance to those efforts is one characterized by both *de jure* and *de facto* discrimination. Indeed, it would take a multi-volumed treatise to properly describe the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process.

636 F. Supp. 1113, 1116 (E.D. La.1986). Noting this factor in particular, the court in that case

---

[18]*Gingles* dealt with a challenge to a multi-member district, unlike here where the creation of single-member districts also is being challenged. The *Gingles* principles have, however, been extended to challenges to single-member districts. *See Growe v. Emison*, 507 U.S. 25, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993); *Clark v. Calhoun County*, 88 F.3d 1393, 1394 (5th Cir. 1996).

found that the plaintiffs had prevailed under the totality test. *See id.* at 1135. The defendants concede that the Parish shares the same segregationist history as the State of Louisiana and much of the South. *See* defendants' memo at 6. The defendants note, however, that Parish public schools have been desegregated since July 1968, a claim uncontested by the plaintiffs. *See id.*[19] Nevertheless, the defendants do not explain how the timing of Parish public school desegregation distinguishes the Parish's history of racial discrimination from that found in *Citizens for a Better Gretna*. Thus, this factor favors the plaintiffs' position.

With respect to the second factor, again, one of the two most important, racial polarization in voting has been shown under the *Gingles* criteria. Thus, this factor also favors the plaintiffs' position.

As for the third factor, the plaintiffs conceded at the hearing that no particular voting practices or procedures have been shown that "may enhance the opportunity for discrimination against the minority group." Likewise, with regard to the fourth factor, the plaintiffs presented no evidence nor claimed that a "candidate slating process" impedes their access.

The fifth factor--whether the minority group is hindered in its ability to effectively participate in politics because of "the effects of discrimination in such areas as education, employment and health"--favors the plaintiffs' position. Census information establishes that the Parish's black residents earn significantly less income than their white neighbors. *See* Ex. 32. For example, according to the 1990 census information, more than 50 percent of black households

---

[19]Under Defendants' uncontested version of Parish history, Parish schools were desegregated fourteen years after *Brown v. Board of Educ.*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), and approximately three years ahead of nearby Jefferson Parish, Louisiana, schools. *See Dandridge v. Jefferson Parish Sch. Bd.*, 332 F. Supp. 590 (E.D. La. 1971), *aff'd*, 456 F.2d 552 (5th Cir.), *cert. denied*, 409 U.S. 978, 93 S. Ct. 306, 34 L. Ed.2d 240 (1972).

earned less than $15,000 per year, as compared to only 27 percent of white households earning less than that amount. Similarly, more than 45 percent of black Parish residents have less than a high school education as compared to 32 percent for white residents.

> Both Congress and the Courts have recognized the effect lower socio-economic status has on minority participation in the political process. The Senate Report states:
>
>> "The courts have recognized that disproportionate educational[,] employment, income level[,] and living conditions arising from past discrimination tend to depress minority political participation . . . . Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation."
>
> 1982 Senate Report at 29 n. 114. *See also, Major v. Treen*, 574 F. Supp. 325, 351 (E.D. La.1983).
>
> In sum, the depressed levels of income, education and employment are a consequence of severe historical disadvantage. Depressed levels of participation in voting and candidacy are inextricably involved in the perception of futility and impotence such a history engenders.

*Citizens for a Better Gretna*, 636 F. Supp. at 1120 (changes in original).

With respect to the sixth factor, the plaintiffs did not claim or present evidence at trial that campaigns in the Parish have been characterized by overt or subtle racial appeals. At this juncture, however, a comment on the testimony of Senator Dean is appropriate. Senator Dean testified that he has been involved in Parish politics since the 1960's. He also testified that he was elected to the Board in 1981 and served in that capacity until he was elected as Parish Council President in 1992. Near the end of that four-year term, he testified, he ran for and was elected to the State Senate. Senator Dean testified--and this Court does not dispute--that he has received

18

black support in his prior candidacies. When asked whether he had heard the word "nigger" used in the Parish, he indicated that he uses the term himself, has done so recently, that he does not necessarily consider it a "racial" term and that it is usable in jest, as well. Senator Dean's casual and startlingly insensitive attitude towards the use of the word was deeply disturbing. Senator Dean, as a former Board member, former Parish President and now State Senator, is one of the highest ranking, if not the highest ranking, public official in the Parish.

With respect to the seventh factor, whether members of the minority group have been elected to public office in the parish, the answer is "no." Only three blacks have run, and none has come even close to being elected. As noted above, this factor, along with racial polarization in voting, is considered the most significant in support of a voting rights violation.

As for the eighth factor, no specific evidence was presented that elected officials have ignored the needs of their black constituents.

With respect to the ninth factor, the plaintiffs conceded that the challenged 5-2 plan was not enacted with racial animus as a motivation.

Of the nine factors then, four and arguably five favor the plaintiffs' position. Significantly, the two considered to be the most important--racial polarization in voting and the lack of any minority elected officials--are clearly present. Accordingly, the plaintiffs have prevailed under amended § 2's totality of the circumstances test.

V. Conclusion

For all of the above stated reasons, the Court has granted the plaintiffs' claim for

injunctive relief and declared the 5-2 plan invalid as a violation of § 2 of the Voting Rights Act.

New Orleans, Louisiana, this 20 day of August 2002.

_____
HELEN G. BERRIGAN,
UNITED STATES DISTRICT JUDGE